```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF TEXAS
 2                   CORPUS CHRISTI DIVISION

 3    BEVERLY LASOURD              *
                                   *
 4    VS.                          *       CIVIL ACTION NO. B-04-067
                                   *
 5    TARGET STORES AND TRACY      *
      CASTILLO                     *
 6
                       REPORTER'S CERTIFICATION
 7                  DEPOSITION OF BEVERLY LASOURD
                          November 9, 2004
 8
           I, MARICELA FLORES, Certified Shorthand Reporter in and for
 9    the State of Texas, hereby certify to the following:

10         That the witness, BEVERLY LASOURD, was duly sworn by the
      officer and that the transcript of the oral deposition is a true
11    record of the testimony given by the witness;

12         That the deposition transcript was submitted on
           November 19, 2004  to the witness or to the attorney
13    for the witness for examination, signature, and to be returned
      to U. S. LEGAL SUPPORT, INC. by December 13, 2004          ;
14
           That the amount of time used by each party at the
15    deposition is as follows:

16         MR. ROBERT S. NICHOLS - 3 hours and 31 minutes

17         That pursuant to information given to the deposition
      officer at the time said testimony was taken, the following
18    includes all parties of record:

19         MR. MIGUEL SALINAS, Counsel for Plaintiff(s)
           MR. ROBERT S. NICHOLS, Counsel for Defendant(s)
20
           I further certify that I am neither counsel for, related
21    to, nor employed by any of the parties or attorneys in the
      action in which this proceeding was taken, and further that I am
22    not financially or otherwise interested in the outcome of the
      action.
23
           Further certification requirements pursuant to Rule 203 of
24    TRCP will be certified to after they have occurred.

25
```

**APPENDIX 29**

162

```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE SOUTHERN DISTRICT OF TEXAS
 2                    CORPUS CHRISTI DIVISION

 3   BEVERLY LASOURD              *
                                  *
 4   VS.                          *      CIVIL ACTION NO. B-04-067
                                  *
 5   TARGET STORES AND TRACY      *
     CASTILLO                     *
 6
             FURTHER CERTIFICATION UNDER RULE 203 TRCP
 7             ORAL DEPOSITION OF BEVERLY LASOURD
                        November 9, 2004
 8
         The original deposition        was        was not
 9   returned to the deposition officer;

10       If returned, the attached Changes and Signature Page
     contains any changes and the reasons therefor;
11
         If returned, the original deposition was delivered to MR.
12   ROBERT S. NICHOLS; Custodial Attorney;

13       That $            is the deposition officer's charges
     for preparing the original deposition transcript and any copies
14   of exhibits charged to Defendant(s);

15       That a copy of this certificate was served on all parties
     herein and filed with the Clerk.
16
         Certified to by me this                day of
17                              , 2004.

18

19
                    MARICELA FLORES
20                  Certified Shorthand Reporter
                    Certificate No. 2558
21                  Expiration Date:  12/31/2004
                    for
22                  U. S. LEGAL SUPPORT, INC.
                    Firm Registration No. 342
23                  500 North Water Street
                    Suite 500 South
24                  Corpus Christi, Texas 78471
                    Telephone (361) 883-1716
25
```

**APPENDIX 30**

1               IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF TEXAS
2                   CORPUS CHRISTI DIVISION

3   BEVERLY LASOURD                *
                                   *
4   VS.                            *        CIVIL ACTION NO. B-04-067
                                   *
5   TARGET STORES AND TRACY        *
    CASTILLO                       *
6

7   ****************************************************************

8              THE VIDEOTAPED ORAL DEPOSITION OF

9                      BEVERLY LASOURD

10                    November 9, 2004

11  ****************************************************************

12

13      ORAL AND VIDEOTAPED DEPOSITION OF BEVERLY LASOURD,

14  produced as a witness at the instance of the Defendant(s), and

15  duly sworn, was taken in the above-styled and numbered cause on

16  the 9th day of November, 2004, from 10:14 a.m. to 4:27 p.m.,

17  before MARICELA FLORES, CSR in and for the State of Texas,

18  reported by machine shorthand, at the Law Offices of Miguel

19  Salinas, 803 Old Port Isabel Road, Brownsville, Cameron County,

20  Texas, pursuant to the Texas Rules of Civil Procedure and the

21  provisions stated on the record or attached hereof.

22

23

24

25

                                        **APPENDIX 31**

DEPOSITION OF BEVERLY LASOURD

```
 1    Q    Is that a yes?

 2    A    Yes.

 3    Q    When you asked to be moved from the door greeter

 4  position to the -- to the jewelry boat, who did you approach or

 5  who did you speak with about being moved?

 6    A    God, I can't -- I can't remember.  I asked somebody from

 7  the cash -- from up front.  I can't remember.  I'm sorry.

 8    Q    Okay.  When you asked to be moved from -- out of the

 9  jewelry boat into a cashier's position, who did you speak with

10  about that move?

11    A    Whoever was in charge up front.  And I don't remember.

12    Q    Okay.  Was there a pay -- was there a pay change

13  involved in moving from the jewelry boat to cashier?

14    A    No.

15    Q    Okay.  All right.  Do you remember what year it was when

16  you went to the cashier's position at the Harlingen store of

17  Target?

18    A    No.

19    Q    After you went to work as a cashier, as a clerk at the

20  front of the Harlingen Target store, did you remain in that

21  position until the end of your employment?

22    A    Yes.

23    Q    Okay.  When working as a cashier or clerk at the front

24  of the Target store in Harlingen, who was your immediate

25  supervisor?
```

**APPENDIX 32**

1    A    Why I'm gone.

2    Q    Right.  Have you spoken with any of your friends about

3  this lawsuit?

4    A    Not really.

5    Q    Well, when you say "not really," does that mean not at

6  all?

7    A    I -- I don't think I have.

8    Q    Okay.  Have you spoken with your children about this

9  lawsuit?

10    A    Of course.

11    Q    I would -- I would think so.  All three of them?

12    A    All three, yes.

13    Q    Okay.  Other than your lawyer and your three children,

14  who have you spoken with about this lawsuit?

15    A    Diane.

16    Q    Okay.  Other than Diane, your lawyer and your children,

17  who else have you spoken with about this lawsuit?

18    A    Nobody that I can remember.

19    Q    Has anyone indicated to you in any way that they've got

20  testimony or facts to share that would support your case?

21    A    Not that I can think of.

22    Q    Okay.  You -- you are claiming age discrimination in

23  this lawsuit; is that correct?

24    A    Right.

25    Q    Did anyone -- did you ever see anything in writing to

**APPENDIX 33**

DEPOSITION OF BEVERLY LASOURD                                    11/9/2004

51

1  indicate that you were being terminated because of your age?

2      A    No.

3      Q    Okay.  No one ever told you you were being terminated

4  because of your age, did they?

5      A    No.

6      Q    Okay.  You don't have any facts that would show you were

7  terminated because of your age; am I correct?

8      A    You're correct.

9      Q    Okay.  Ms. Castillo, Tracy Castillo, before -- before

10  these events blew up about the transactions at issue, did you

11  know who she was?

12     A    Repeat that again.

13     Q    Before the controversy about the transactions at the end

14  of your employment at Target, did you know who -- did you know

15  who Tracy Castillo was?

16     A    She was security.

17     Q    Okay.  And had you had any interaction with her, Ms.

18  LaSourd?

19     A    No.

20     Q    Okay.  I want to ask you about -- about what your

21  understanding when you worked as a cashier or clerk at Target,

22  what your understanding was of what -- of what discretion or

23  authority you had when there was a dispute with a customer at

24  the register about price.

25              If a customer -- if an item was marked or it

**APPENDIX 34**

1    Q    There were a lot of employees in there who were in their

2    twenties or thirties, correct?

3    A    Right.  And younger.

4    Q    Okay.  And younger.  Can you name one employee in their

5    twenties or younger who you believe received bigger pay

6    increases than you did because of age?

7    A    All of them.

8    Q    Yeah.  But, I mean, Target has a lot of employees.  Can

9    you point to one example?  Just one.

10   A    I don't know if they're even there anymore.

11   Q    But can -- are you -- can you point to any examples?

12   A    I wish I had -- I wish I had my list of names.  Do you

13   have the list of names that I gave to Carl?

14   Q    Oh, and we'll get to them.  Thank you.

15   A    It's on -- it's on there.  I don't know the boy's name

16   right offhand, but it was on there.

17   Q    Okay.  And we'll get to that later on.  And I -- I

18   appreciate you raising that.  The -- other than the fact that

19   you believe some older employees did not get as many hours and

20   just the fact that you say that there were younger employees who

21   got bigger pay increases, what other facts can you point to, Ms.

22   LaSourd, that lead you to believe you received smaller pay

23   increases because of your age?  Anything else?

24   A    What other fact?

25   Q    Yes.  Yes, ma'am.  Anything else besides that?

**APPENDIX 35**

1    A    It's a proven fact.  We didn't get no hours, and we

2  didn't get the raises.

3    Q    So that's all?  That's everything?

4    A    That's it.

5    Q    The -- now, did you -- was it your understanding that at

6  Target there was some notion of reaching a maximum range in

7  terms of pay for an employee?  Did you -- did you -- was that

8  something you were acquainted with?

9    A    No.

10   Q    Did you have any sense that employees would reach a

11  point where their -- they did not receive pay increases unless

12  they scored an excellent or outstanding level on their

13  performance evaluation?

14   A    No.

15   Q    Okay.  Can you tell me whether there was more

16  opportunity for a newer employee who may be lower in the range

17  to get bigger pay increases than a longer term employee who had

18  reached the maximum?  Do you know anything about that?

19   A    No.

20   Q    Okay.  To the best of your knowledge, was there any

21  limit or -- on how high an employee could go in their job

22  position with regard to pay?

23   A    If there was, I hadn't heard it.

24   Q    Okay.  Do you know -- did you work with any other

25  employees who were in their sixties or seventies besides

**APPENDIX 36**

1   Q    Okay.  Do you have any facts that support that

2   intuition?

3   A    No.  Well, you can go in the store.

4   Q    Okay.

5   A    There's no old people there.

6   Q    Okay.

7   A    And there's -- I don't believe there's any gringos

8   anymore.

9   Q    The -- do you think you were discharged also because of

10  your -- the fact you're Anglo?

11  A    Yes.

12  Q    Okay.  Do you think that Ramona favored Hispanic

13  employees?

14  A    Some, yes.  I don't think -- there's some she's not even

15  good to them.

16  Q    Okay.  But you believe one of the reasons for your

17  discharge was the fact that you were Anglo, correct?

18  A    Age and Anglo.

19  Q    Okay.  The -- so do you think Ramona was upset with the

20  fact that you asked for more hours?

21  A    She acted like I wasn't -- didn't have enough brains to

22  answer the phone.

23  Q    Okay.  My question was, do you think she was -- because,

24  I mean, I want to make sure I'm clear with you and fair.  Do you

25  think she was -- do you think she was mad at you, Beverly,

**APPENDIX 37**

1   and a half.  Not quite two years, I don't think.

2            Anyway, he went in every morning, I believe, at

3   7:00.  And he got out about 12:00, 12:30.  He'd punch out for

4   lunch, come back and punch in as a cashier.  And they'd come

5   over and send one of us home and cut us, and give him the hours.

6   Q    And what was his name?

7   A    Now, that went on all the time.  And it happened to me

8   and this Rosemary I told you about who came down from Sioux

9   City.  And it happened to a few of the other cashiers, too.

10            And I went over to him one day.  And I said,

11  "Ricky, don't you feel guilty taking -- we get cut and you get

12  the hours."  I said, "You've already did your day's work.  And

13  you want more?"

14            And he said to me, he said, "You know, I don't give

15  a damned whose I take.  I'm going to get forty hours."  And I

16  said, "You mean" -- and this don't sound nice.  But I said --

17  oh, I said, "You really kiss a lot of butt around here."

18            And he said, "Well, I'm getting the hours."  And

19  that was it.  And three days later, they called me up to the

20  office and there I was.

21  Q    When you say Ricky kissed a lot of butt, what does that

22  --

23  A    Oh, he did.

24  Q    What does that mean, though?

25  A    He kissed up to get the hours.  I don't do that.

DEPOSITION OF BEVERLY LASOURD                                    11/9/2004

82

```
 1   downstairs in security office, no.

 2      Q    Oh, you didn't go back to Ramona's office?

 3      A    No.  When I went back, it was there.

 4      Q    Well, how did you know to go to security office and not

 5   Ramona's office?

 6      A    Somebody told me.  And I've been racking my brain trying

 7   to say that they said Tracy was in there.  And I can't think of

 8   who it was.  But they had somebody standing there that said,

 9   "Beverly, Tracy's in there."  And I said, "Oh."  So I went in.

10   Knocked and went in.

11      Q    Okay.

12      A    Because otherwise, I'd have went back upstairs.

13      Q    And when you -- when you -- when you found Tracy, who

14   was with her?

15      A    Robert.

16      Q    Was Titi still there?

17      A    No.

18      Q    Okay.  So when you -- when you -- when you got back --

19   when you got to Tracy with the check, what was said between

20   you-all?

21      A    Nothing.

22      Q    You just handed her the check and not a word was said?

23      A    No.

24      Q    Okay.  So what was your understanding of your -- of your

25   employment with Target at that point in time?
```

**APPENDIX 39**

1    A    Oh, you're done.  When they're going to have you taken

2    out in handcuffs, you're done.

3    Q    But -- but they never said you were terminated?

4    A    Oh, yes, she did.

5    Q    What specifically did she say?

6    A    I can't put it in exact words.  But I was fired.  She --

7    yeah.  That's -- that was -- that came out, yes.

8    Q    I understand.  But, Ms. LaSourd, was this -- was this at

9    this first meeting where Robert and Titi and Tracy were all in

10   Ramona's office?

11   A    No.  The second, no.

12   Q    This was when you just took the check back?  Because

13   this is important.  Did -- are you saying you were told you were

14   terminated?

15   A    Yes.

16   Q    Who told you that?

17   A    Tracy.

18   Q    And did she tell you that before or after you retrieved

19   the check?

20   A    Was it before?  I can't remember.

21   Q    Okay.  Can you remember what words she used?

22   A    "You're done."  "You're fired."  "You're done."

23   Q    Okay.  Well, was it -- was it -- because I want to make

24   sure I get your story -- I want to be fair and make sure I get

25   your story straight.  Did she say, "You're done"?  Or, "You're

```
 1    Q     Okay.

 2    A     Not to my knowledge, huh-uh.  We never discussed it.

 3             MR. NICHOLS:  Mari, could you mark this?

 4             (Exhibit No. 1 marked.)

 5    Q     Ms. LaSourd, I'd like to hand you what's been marked as

 6  LaSourd Exhibit 1.  And I'd like you to tell me if you can

 7  identify what that is.

 8    A     Speed Report for Cashiers.

 9    Q     Okay.  Why don't we -- why don't we -- he's got to

10  change the tape.  Why don't we take a break right now.

11    A     Uh-huh.

12    Q     He's handed me a note.  Before we get into this.  And

13  then we'll --

14    A     Okay.

15             VIDEOGRAPHER:  Off record.

16             (Off the record from 1:34 p.m. to 1:55 p.m.)

17             VIDEOGRAPHER:  Back on record.

18    Q     Ms. LaSourd, we're back from a break.  Have you had an

19  opportunity what's been marked -- to read what's been marked as

20  LaSourd Exhibit 1?

21    A     This here?

22    Q     Yes, ma'am.

23    A     Yeah.  I'm looking at it.

24    Q     Okay.  Do you recognize that piece of paper as something

25  you've seen before?
```

**APPENDIX 41**

DEPOSITION OF BEVERLY LASOURD                                      11/9/2004

101

```
 1    A    Uh-huh.

 2    Q    Is that a yes?

 3    A    Yes.

 4    Q    Is it -- is it correct to say that this -- that this

 5   Target document, this is something you saw during the time you

 6   worked at Target?

 7    A    Yes.  It was on speed, uh-huh.

 8    Q    Okay.  And it talks about a twenty dollar rule?

 9    A    Uh-huh.

10    Q    Correct?

11    A    Right.

12    Q    And now -- but I am correct that it also requires that

13   the -- that the guest's or customer's position on the price must

14   be reasonable?

15    A    Yes.

16    Q    Okay.  I want to ask you a couple of questions about --

17   about this.  Would you agree that if -- that if a customer

18   indicated that a book that scanned at eighteen dollars and

19   eighty-six cents should be priced at two dollars and fifty cents

20   -- okay.  Let me start again.  I wasn't clear.

21              Would you agree that if a customer indicated that a

22   book that scanned for eighteen dollars and eighty-six cents

23   should be sold to them for two dollars and fifty cents, would

24   you agree that that would be unreasonable of the customer?

25    A    Yes.  Only if it wasn't on sale.  And I -- I recall that
```

**APPENDIX 42**

1   what it was for.  But I remember the code, yeah.

2      Q    Is it correct to say, Ms. LaSourd, you often, in giving

3   customers substantial breaks, would indicate by the code you put

4   into your register that you -- that the item was Christmas

5   decorations?

6      A    Yeah.  And I wasn't the only one, yes.

7      Q    And you did that because --

8      A    It was the only code I had.

9      Q    Because -- because coding -- because Christmas

10  decorations, after Christmas, were sold at steep discounts,

11  right?

12     A    Yes.

13     Q    So if you coded something as a Christmas decoration,

14  that wouldn't raise a red flag, a big price break, correct?

15     A    It wouldn't what, sir?

16     Q    It wouldn't raise a red flag?  It wouldn't be unusual

17  for Christmas decorations to be sold at a deep discount,

18  correct?

19     A    No.

20     Q    Okay.  And it is correct that you were -- that you were

21  selling other items well below the scanned price and coding them

22  as if you were selling a Christmas decoration, correct?

23     A    Not to my knowledge.  I don't -- I don't ever remember

24  doing that.

25     Q    Would you agree that if you, for example, sold a

**APPENDIX 43**

DEPOSITION OF BEVERLY LASOURD

11/9/2004

109

1    A    Ninety-one.

2    Q    And month and year is?

3    A    8-16.

4    Q    Okay.  Do you remember being -- okay.  Let me see.  I

5    think we'll go to this one next here.

6              (Exhibit No. 5 marked.)

7    Q    Ms. LaSourd, could you identify what's been marked as

8    LaSourd Exhibit 5?

9    A    Training Checklist.

10   Q    Do you see your signature down below somewhere?

11   A    Yes.  I sure do.

12   Q    Okay.  And what date have you written next to your

13   signature?

14   A    9-13-93.

15   Q    Do you remember being trained on this issue of where

16   guests would challenge the scanned price or where -- or what to

17   do when there was -- when the item would not scan?

18   A    Do I remember?  No.  It's been a while.

19   Q    Okay.  Did they train you about this requirement of

20   reasonableness that we've talked about?  Were you trained on the

21   notion that you could -- that you could not give a price break

22   off the scanned price that was unreasonable?  Were you trained

23   about that?

24   A    Oh, we knew that, yes.

25   Q    So you were trained about that?

**APPENDIX 44**

1    A    Yes.

2    Q    If -- if the -- if you -- if things were not busy and

3  there was a -- and there was a discrepancy -- you know what I

4  mean by when I say "discrepancy," right?

5    A    (Moving head up and down.)

6    Q    You understand what I mean by "discrepancy"?

7    A    Yeah.  I think so.

8    Q    Okay.  When there was a discrepancy between the scanned

9  price and what the customer was claiming the price should be, if

10 you weren't busy at your line, what was normal procedure?

11   A    Well, if we weren't busy, you'd turn off the light and

12 go check it yourself.

13   Q    Okay.  And you mentioned earlier another option was you

14 could have someone else check, correct?

15   A    That's right.

16   Q    Okay.  And that's what you were supposed to do if

17 conditions weren't busy, correct?

18   A    Yes.

19   Q    Okay.  For example, if there was no one waiting in your

20 line behind the customer you were taking care of, that would be

21 an example of where things were not busy; am I right?

22   A    Yeah.

23   Q    Is that a yes?

24   A    Yes.

25   Q    Okay.  And under those circumstances, you would -- you

**APPENDIX 45**

DEPOSITION OF BEVERLY LASOURD                                      11/9/2004

```
 1   Exhibit 9?

 2       A    Pretty -- pretty much, yeah.

 3       Q    Okay.  Are all of the statements included in this

 4   document marked as Exhibit 9 true and correct?

 5       A    Pretty much so, yeah.  I think so.

 6       Q    Is there anything in here that you think is incorrect?

 7       A    I think it's -- I think it's okay.  I think it's fine.

 8       Q    You think it's all correct?

 9       A    Pretty much, yeah.

10       Q    Well, you say --

11       A    I say pretty much.

12       Q    Okay.

13       A    I mean, it is, yeah.

14       Q    You know -- you know lawyers.  You say "pretty much,"

15   I'm going to ask you --

16       A    Well, yeah.

17       Q    Is there anything that is incorrect?

18       A    Not to my knowledge.

19       Q    Okay.  Does this appear to be a piece of paper that you

20   prepared and submitted to the EEOC?

21       A    I think this is a piece of paper that Robert and I sat

22   and -- Robert and I --

23       Q    Okay.  And I don't want --

24       A    -- sat and talked this over.

25       Q    Yeah.  And anything that you discussed with Mr. Salinas'
```

**APPENDIX 46**

1   staff, I don't want to know about.

2       A    Okay.  No.  This is -- this is accurate.

3       Q    Okay.

4              (Exhibit No. 10 marked.)

5       Q    Okay.  Ms. LaSourd, I'd like you to identify what's been

6   marked as LaSourd Exhibit 10.

7       A    Uh-huh.

8       Q    Could you identify for us what that document is?

9       A    Charge of Discrimination.

10      Q    Okay.  Whose signature appears on the lower left-hand

11  corner of the document?

12      A    Mine.

13      Q    And what date have you written next to your signature?

14      A    4-22-03.

15      Q    Okay.  Is it -- who's the notary who notarized this

16  document?

17      A    Sandra Hedegard.

18      Q    And --

19      A    That's my daughter.

20      Q    That's what I -- that's what -- that's what -- and did

21  your daughter help you prepare this?  Or did she just notarize

22  it?

23      A    She just notarized it.

24      Q    Is all -- are all of the statements made in this

25  document, LaSourd Exhibit 10, true and correct?

**APPENDIX 47**

1    A    Yes.

2    Q    Okay.  Now, in this charge you made to the EEOC, you're

3    claiming that you were discharged because of your age, correct?

4    A    Correct.

5    Q    But you told us today you also believe you were

6    terminated because you are an Anglo person, a white person,

7    correct?

8    A    Correct.

9    Q    Okay.  Do you believe Target had any other reason for

10   terminating you other than your age and the fact that you're

11   Anglo or white?

12   A    From what I can see, the changing of price.  And they're

13   still doing it.

14   Q    Okay.

15   A    It's a store policy, and they're still doing it.

16   Q    Do you --

17   A    But I was the only one that was discriminated against.

18   They used me as an example.

19   Q    Do you believe that -- that anyone at Target, Tracy

20   Castillo or anyone else, had any real concerns about these

21   transactions?

22   A    Had any real concerns about what?

23   Q    About your transactions that --

24   A    Of changing price?

25   Q    Yes.

**APPENDIX 48**

1    Q    Yes.

2    A    Four months?

3    Q    That's correct.

4    A    Not to my -- I -- I don't remember.

5    Q    Okay.  I want to turn your attention back to Exhibit

6    14.  That's this thing right here.  But before we get into it, I

7    want to ask you a couple of questions.  I just want to make sure

8    I understand what your lawsuit's about.  I want to make sure I

9    have a fair understanding of what you're claiming.

10                   In this lawsuit, you're claiming age

11   discrimination, correct?

12   A    Right.

13   Q    And you're saying that you believe your discharge from

14   employment with Target was based upon your age, correct?

15   A    Right.

16   Q    And you're claiming that you believe your pay increases

17   were smaller because of your age, correct?

18   A    Right.

19   Q    So you're claiming age discrimination with regard to

20   your discharge from employment and pay increases at Target,

21   correct?

22   A    Correct.

23   Q    And those are the only employment decisions by Target

24   that you're complaining about in this lawsuit; am I right?

25   A    That, and color.

**APPENDIX 49**

1    A    Yeah.

2    Q    But I'm talking about the actions, the decisions.

3  You're saying that you believe they were discriminatory.  Okay?

4    A    Right.

5    Q    Am I right?

6    A    Right.

7    Q    And you're saying you believe they were discriminatory

8  with your discharge, right?

9    A    Right.

10   Q    That decision.  And you think decisions about the size

11 of your pay increases were discriminatory, too?

12   A    Oh, definitely.

13   Q    In this lawsuit, are you claiming any other employment

14 decisions --

15   A    No.

16   Q    Okay.

17   A    Not to my knowledge, no.

18   Q    So this lawsuit, this discrimination lawsuit's about pay

19 increases and it's about your firing, as you -- as you see it,

20 from Target, correct?

21   A    (Moving head up and down.)

22   Q    Am I right?

23   A    Right.

24   Q    Okay.  And you -- and you're claiming that Target had

25 two reasons or motivations for your discharge?  Your color,

**APPENDIX 50**

1  white, and your -- and your age?  Am I right?

2      A    Right.

3      Q    Okay.  Do you believe that Target had any other

4  motivations?

5      A    That's enough.

6      Q    Oh --

7      A    What they have.

8      Q    Yeah.  But do you think -- I understand that.  Do you

9  have -- do you -- do you believe they had any other reasons or

10 motivations for terminating you other than your color or race,

11 white, and your age?

12     A    They're using price changes, but I did go by the book.

13     Q    Okay.  You don't -- are you saying you don't believe

14 what they're saying about price changes?

15     A    They're still doing it.

16     Q    Okay.  Other -- okay.  I just want to make sure I get my

17 question answered, just because I want to understand your

18 lawsuit.  I want to -- this is my one chance to ask you

19 questions, so I need to make sure I don't miss something big.

20          You're -- you're -- you're saying that your size of

21 your pay increases and your discharge were motivated by your

22 race or color, white, and your age, correct?

23     A    Correct.

24     Q    Do you believe Target had any other motivation asides

25 your color or race, white, any your age for those decisions?

**APPENDIX 51**

1  that you were terminated because of your age.  And you told us

2  you're claiming you were terminated and discriminated against

3  because you are white.

4          Now, are you claiming in this lawsuit that you were

5  terminated because you opposed discrimination or protested

6  discrimination?  Are you making that kind of claim in this case?

7  A    No.  Not really.

8  Q    Okay.  You're not, right?

9  A    I don't think so.

10         MR. NICHOLS:  Okay.  All right.  Well, I -- I don't

11  have any other questions.  And I appreciate your time today.

12         MR. SALINAS:  We'll reserve our questions till time

13  of trial.  That's it.  We're done.

14         VIDEOGRAPHER:  Off the record.

15         (The deposition concluded at 4:27 p.m.

16         on November 9, 2004.)

17

18

19

20

21

22

23

24

25

**APPENDIX 52**

1    Certified to by me this        _15_        day of
2            _November_ , 2004.

3                    
4            MARICELA FLORES
             Certified Shorthand Reporter
5            Certificate No. 2558
             Expiration Date:  12/31/2004
6            for
             U. S. LEGAL SUPPORT, INC.
7            Firm Registration No. 342
             500 North Water Street
8            Suite 500 South
             Corpus Christi, Texas 78471
9            Telephone (361) 883-1716

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**APPENDIX 53**

EEOC Form 5 (5/01)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | 360-2003-01146 |

| Texas Commission On Human Rights | and EEOC |
|---|---|

*State or local Agency, if any*

| Name *(Indicate Mr., Ms., Mrs.)* | Home Phone No. *(Incl Area Code)* | Date of Birth |
|---|---|---|
| Beverly Lasourd | (956) 423-3453 | 03-29-1928 |

| Street Address | City, State and ZIP Code |
|---|---|
| 1327 E. Washington Ave. Harlingen, TX 78550 | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe, Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| TARGET | 500 or More | (210) 421-4900 |

| Street Address | City, State and ZIP Code |
|---|---|
| 1002 Dixieland Rd.  Harlingen, TX 78550 | |

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

**DISCRIMINATION BASED ON** *(Check appropriate box(es).)*

☐ RACE  ☐ COLOR  ☐ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN
☒ RETALIATION  ☒ AGE  ☐ DISABILITY  ☐ OTHER *(Specify below.)*

**DATE(S) DISCRIMINATION TOOK PLACE**
Earliest: 06-12-2002   Latest: 04-3-03

☐ CONTINUING ACTION

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

On or about 4-3-03 I was discharged.

I was told I was being discharged for stealing.

Since prior to June 12, 2002, I have not received raises similar to younger employees.

I believe I have been discriminated against because of my age, in violation of the Age Discrimination in Employment Act of 1967, as amended.

*LaSourd*
EXHIBIT
10
CASE#_____

SANDRA MAXINE HEDEGARD
MY COMMISSION EXPIRES
June 16, 2003

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| | Sandra Maxine Hedegard |
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| X 04-22-03   X *Beverly Lasourd*<br>Date          Charging Party Signature | SUBSCRIBED AND SWORN *(month, day, year)*<br>04/22/03 |

**APPENDIX 54**